24-2062 Rael v. City of Albuquerque, Mr. Villa. May it please the Court, Counsel. The District Court erred in granting summary judgment for Defendant Willsie on qualified immunity grounds, and the error was as to both prongs of the Qualified Immunity Analysis. Primarily, the Court erred in resolving disputes of fact that were critical to both prongs of the Qualified Immunity Analysis in favor of the defense rather than the plaintiff. And had it resolved those disputes of fact in favor of the plaintiff, we submit Qualified Immunity would not be warranted on either prong of the analysis. The most essential dispute of fact in this case was what was Mr. Cordova, the decedent, doing at the time he was shot. Officer Willsie, Defendant Willsie testified under oath that he was advancing beyond his truck in the driveway from which he was originally positioned and pointing his gun in the direction of officers when he fired. On the other hand, at the moment the shot can be heard on the ring video, it can be seen that Mr. Cordova was not advancing past his truck, in fact had his firearm pointed towards the ground and was yelling at police to shoot him. And this goes to what is the most critical part of the Qualified Immunity Analysis, which was, was Mr. Cordova a threat at the moment in time in which he was killed? And the district court in analyzing the Graham factors and the Larson factors ignored some of the critical facts that determine whether someone is a threat under those circumstances. Facts that this court has previously analyzed and discussed primarily in Pauley v. White, the last version of Pauley v. White that the court decided after the U.S. Supreme Court made its ruling. And that is when police officers are behind cover and at a great distance away, in this case the minimum distance for the closest officer was 50 yards, viewing the evidence in the light most favorable to plaintiff, and that they were behind cover. In Pauley v. White, the decedent in that case was actually pointing the firearm when he was killed at police, there wasn't a dispute of fact about that, the dispute of fact was whether the decedent had actually fired shots, but the officer, because he was safely behind cover, the officer who believed he was in danger and filed the shots that killed Pauley, it was determined by this court that that was a Fourth Amendment violation, if true, because he was safely behind cover and not in danger at the time. In this case, Mr. Cordova wasn't pointing the firearm. When you look at the ring video, at least a jury could reach that conclusion and discredit Defendant Willsie's testimony that he was pointing the firearm. And that's the starting point, I think, for the analysis because it's the second grand factor, you know, in the Larson factors, it's probably the most important factor, and that wasn't changed, Your Honors, by the U.S. Supreme Court's decision in Barnes v. Felix. I know there was a... Let me stop you on the facts, though. Is the issue when, do the officers have to wait until the suspect points the gun? Isn't it enough to be raising the gun? Your Honor, in this situation, I think that that could be true, right? If he's raising the gun and an officer reasonably believed he was going to shoot it, but based on his words, actions, demeanor, yes, I think that that could be a situation. But here, that wasn't the situation. He wasn't raising his gun as if to point it, at least there is evidence, video evidence from which a jury could determine that he was not raising his gun as if to point it. So I think we're dealing with a different situation, but again, Polly... It's not whether the jury could find that he wasn't raising the gun, it's whether an officer could reasonably believe that he was raising the gun. I mean, he had shot the gun before, right? Correct. In fact, he had discharged it about 10 minutes prior to when he was killed. From the evidence, it appears he discharged it into the ground, either on purpose or accidentally, but had not discharged it from anybody's view, the video or the police who could see him towards police or towards the neighborhood or a house or anyone else. I'm sorry. No, go ahead. It is true though, isn't it, from the video, you can see it and it's certainly consistent with all the testimony that this individual was acting very erratically, extremely erratically at the moment. He was screaming, screaming, shoot, shoot, yelling, moving around, kind of waving his arms and he had, you know, had been sometime before, but he had definitely pointed the gun at the officers at one point and he had over and over and over again resisted their commands to put down the gun, raise your hands, walk toward us, through this whole thing. He was erratic and never complied. And in the very end, he's literally screaming, shoot, shoot, shoot, and moving his arm around. Why in that case wasn't it reasonable for the officer to believe that he had, you know, there was a threat at that moment? Because, Your Honor, I think we have to pick each of those facts apart, applying the Larson factors. So, certainly, you know, the first Larson factor, which is really the third Graham factor, you know, is the suspect complying with commands or are they resisting? I mean, there's no resistance from the plaintiff that Mr. Cordova was not complying with commands, he wasn't listening to the police. However, he was in a position in which he was in the driveway, sort of barricaded behind a truck, was not advancing on police or firing on police or firing on anyone else. And then you have to analyze the fourth Larson factor, the manifest intentions of the decedent. And that's where I think the court's precedent in Ceballos and Velarde comes into play, right? And Ceballos and Velarde teach us that someone who's suffering from diminished capacity, like Mr. Cordova obviously was from the video, can be more dangerous or they can be less dangerous and it's very dependent on the circumstances. Here, the facts that favor the plaintiff are that he was suicidal, not homicidal, and that while he wanted police to shoot him, he wasn't taking it to the length of, I'm going to start firing at the police or pointing my gun at the police to get them to shoot me. Even when he's yelling, shoot, shoot, shoot, he's not pointing the gun at police or advancing down the driveway, as Defendant Wilsey testified, towards the police, which we would agree would make a suicidal subject more dangerous. On the other hand, there are suicidal subjects that are less dangerous and then when we look at the moment in time, what are they doing? There's certainly facts here. He pointed the gun at the officers at one point. There is certainly reason for them to suspect that he also might have been interested in killing an officer or someone that was present. He's screaming things that they don't know what they mean. No one knows what he's screaming, but he definitely is screaming, shoot, a lot. So I mean, I see your point about taking the facts in favor of the plaintiff, but we also have facts that would certainly cause a reasonable officer to be concerned that he might shoot someone else, including the officers. Yes, Judge, but because of the disputed facts, because there are facts that say the opposite, the jury should make that decision. And it wasn't proper for a summary judgment. I mean, certainly the law is correct if the facts are, you know, that way, right? And the jury, when properly instructed, would be told if the officer reasonably believed he was going to shoot them or kill them, then the officer can use deadly force and the jury can make that decision. But here we have the facts that support the opposite conclusion, that he was simply just trying to get police to shoot them without taking it that far. And the police should be able to read his mind? It's not reasonable for them, based on his actual behavior? As a matter of law, it's not reasonable for them to have believed that? I think what changes it from some of the other decisions of the court is where Mr. Cordova was located and that he wasn't moving and that the police were behind cover, right? So if you look at some of the other decisions from this court, Thompson, Phillips, Valverde, all these situations are police not behind cover. Even a recent decision from this court that was after the briefing was submitted, which is the Acala versus Ortega decision, right? There was distance in that case, the 35 feet, the police believed that the person had a  It turned out he didn't, but it doesn't matter, they thought he did. But there's no cover, right? There's 35 feet without anything in between the officer and the suspect. Also in those situations, you're dealing with a different scenario. Acala is someone who had committed a crime and is trying to get away from police. He's fleeing, he's not necessarily suicidal. But the test is whether on looking at the facts, what was happening, in the light most favorable to the plaintiff, whether on those facts an officer could objectively, not what they were actually thinking, but objectively reasonable officer could think that there was a threat of great bodily harm. Isn't that basically the test? You seem to be thinking that, conveying that the jury decides whether there was actually a threat of great bodily harm. But once we have the historical facts there, not worrying about anybody's state of mind, we then decide as a matter of law whether a reasonable officer could feel threatened. Correct. Okay, you agree on the standard there? I think it's the standard, yes. But, I'll go ahead. Well, I had one factual question. Looking through the ring hole camera of what's happening at the time of the shooting, I can't really tell whether the decedent had gone past the back of his truck or not. And I'm not quite sure how that's relevant. You talk about he wasn't advancing toward the officers. Can you explain? I'm obviously missing something about that video. Right, so the testimony from Defendant Wilsey is, I saw him advancing towards officers. At the time I shot him, I saw him advancing towards officers. From being protected by the truck to being open. That's right. As if he was getting ready to walk into the street in the direction of where various officers were set up. And you say the video contradicts his testimony? Correct. At the time that he shot him. I can't tell from that angle, how can you tell whether he's beyond the truck or not? Because you see him start to walk towards the pickup. This is not the time he gets shot. He starts to walk towards the back of the pickup, where the bed would be. But then he comes back, closer to the door, the passenger door. And that's where he's kind of positioned as he starts to yell, shoot, shoot, shoot. And then he gets shot. And I think that's the distinction we're drawing here is, if 27 minutes earlier when he's doing this, what I would describe as sort of a drunken waving of the gun, he got shot, we'd be in   If, as hypothetically, you propose, Judge Hartz, he's starting to raise the gun or advance, we're in trouble. But the moment of the threat can pass. And when you have a situation such as this, where there isn't another danger going on, a neighbor comes out, the facts change. Somebody gets through on the roadway that was blocked off, the facts change. But the court has historically analyzed each sort of moment in time when a threat exists and then a threat can pass. And the court recently talked about how a threat can pass, again, in another case that came down after the briefing. But it's supported by our out-of-circuit cases that we provided to the court, which is that a suspect with a gun can be a threat in one moment and it can pass later. But the case is Lofton v. Stapien, and that's a case having to do with positional asphyxiation. But the court talked about how, even if we assume at the beginning of an encounter, under the Larson factors, defendants reasonably perceived a serious threat to their safety that justified the use of deadly force, that calculus changed once the threat had passed. So you have to look at, essentially, the moment in time informed by the totality of the circumstances. And that's where I'm talking about the jury's call of the totality of the circumstances. How do we interpret his behavior from before and leading up to that point in time? And I think that's where it's different, and the decision of, can we say as a matter of law, he was a threat at the time he was shot, can't be made. And let's not forget, there was time, right? If the jury decides he's not advancing, he's not about to shoot, time was on their side. And the SWAT team was on the way, and the testimony was that the SWAT team had lots of different tools to take somebody like Mr. Cordova into custody without killing him and without necessarily putting officers at risk. So, Defendant Willsie could have waited under the circumstances that he found until the SWAT team arrived. They were already on the way, and so because of those other facts that sort of informed the totality of the circumstances, summary judgment was inappropriate. And I see that I'm out of time. Thank you. Ms. Griffin? May it please the Court, Counsel? Your Honor, as you can tell by Counsel's argument, that he overemphasizes the precise moment in time. And the Supreme Court in Barnes v. Felix, as well as this very circuit, has said, albeit that is an important point in time, but we still have to look at it in the context of the totality of the circumstances. And one of the things that Mr. — Are you conceding that at that moment he was not a threat? I'm sorry? Are you conceding that — No, I am not. No, I'm not. But I'm just talking about the standard and what he is focusing on. And so, you know, what the Supreme Court has said in the Barnes v. Felix cases, prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead, they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force. And also, in your decision that you wrote, Your Honor, in the Val Verde case, you also talk about cases where you say this court has repeatedly held that officers in similar actions of the person shot were ambiguous. And what I'm saying here in the context of this case, one of the things that Mr. Villa was pointing out is he keeps saying, well, these — the officers, the other officers besides Officer Wilsey, were behind cover. And if the court recalls, when Officer Wilsey first came on scene, he was talking to Acting Lieutenant Chavez, where Officer Wilsey could stage where he could have a good visibility of Mr. Cordova and also be in a good position to cover. And one of the things that Acting Lieutenant Chavez had said is, we're like sitting ducks out here. And you can also see that from the video footage, that those officers who were staged by the police vehicle, they are not in — they're not feeling exactly very safe by that vehicle. In fact, Officer Bernadette Sanchez, when she was inside of the vehicle trying to give Mr. — or she was giving Mr. Cordova commands, she at one point, in the presence of Officer Wilsey, exits the police vehicle and says, I'm going to get out of here because he's pointing that gun. So those officers were not safely behind cover. And one of the things that I emphasized in the briefing and that Mr. Villa kept emphasizing in his briefing was, well, that — I emphasized that there was no barrier between the officers and Mr. Cordova. And you can see throughout the video in the ring camera that Mr. Cordova is not stagnant. He's — sometimes he's by the door of his truck. He goes out towards the street at some point. He also goes and he walks back and forth along the driveway. And so — but at no point in time — and we all know from the video footage, from all of the audio that you can discern from the OBRDs, that Mr. Cordova — The OBRDs? The officers on body recording devices. That's what they call them. I apologize. That at no point in time did Mr. Cordova respond to even trying to engage in a dialogue with these officers who were trying to, you know, talk to him and, you know, tell him, you know, come towards us with your hands up and empty. At no time did he attempt to comply or to surrender. On page 18 of the answer brief, I outline in very detail what he said just before he was shot. And you can tell that he is like, we're going to end it. He even tells Officer Agner, who's giving announcements, I'm going to hurt you, in response to Officer Agner saying, we don't want to hurt you, John. And then he's saying, I have one more call to make. And he's using all these profane statements. And at no time did he give any indication of surrendering. And if you look at the Val Verde opinion, Your Honor, is — he said the decisive question is whether, in this case, in the Val Verde case, whether Dodge was reasonable in believing that Val Verde was going to fire his gun at Dodge or other officers. And that's the same decisive question here, based upon the factual record in this case. Can you be a little more specific there? Does it matter whether the officer thought he saw him raising the gun at that last moment? I don't think so. I mean, we talk a lot about that, but does it really matter if he was acting erratically and the gun was moving around? I mean, do we need to have — do we need to be able to see in the video that he was raising the gun? No, I don't. I don't believe so in light of the precedent that is discussed in the Val Verde opinion. And what this court has said in Val Verde is it wasn't clear in that case that Val Verde was no longer a threat because it wasn't clear to the officer that he was trying to surrender or dispose of the gun. Here, it is clear that Mr. Cordova was always a threat to these officers. He never gave any indication that he was going to surrender, that he was going to drop the gun. And in fact, right before he shot, he says, you know, profanity, and he says, I got a 45, I got a 45, I got a 45, 1911. And then he says, shoot, shoot, shoot. He at no time dropped the gun, and he was always, always, always throughout this whole event a threat. So that's why it doesn't matter in which direction at the precise moment if he had the gun up, down, pointed at the officers, pointed at himself. Well, if he was talking that way and always holding the gun down, the officers would not have cause to shoot. He's got to do something to show that the victim is going to fire imminently, doesn't he? Don't the officers need that? He could be spouting all sorts of aggressive comments. But if he's just always holding the gun down by his side, the officers would not have cause to shoot him. Well, there's got to be something that triggered the response by the officers, no? And the scenario that you presented, Your Honor, was if he's always holding the gun down, and that's not what the case was, he's moving the gun all around. What about the scenario where he doesn't ever point the gun at the officers and it's clear to the officers he's only talking about suicide, which it did appear for the most part he was talking about suicide or suicide by cop. So, I mean, does that make a difference if they know, even though he's erratic, he's clearly behaving erratically all the way through, and I understand what you're saying about that, but do we have imminent threat here? And what, I guess, what would make it imminent in your view? Well, I think we do have an imminent threat here. Or not imminent, I'm sorry, because you're suggesting that all the way through the threat was potentially imminent, all the way through. Well, I'm saying that he was a threat throughout this whole scenario. But was an imminent threat at all points. Yes, yes. So they could have shot him any time in the last two or three minutes of the episode. Is that what you're, you're going that far? No, what I'm saying is based upon the circumstances, his behavior was escalating. And what I mean by that is during this scenario is he does fire a shot. And you could tell when that moment happened, the officers weren't expecting that. They were even startled. Officer Wilsey, even you can see him kind of, you know, jump when that shot was fired. And given his threats. Was that fired into the ground? Is that, is that clear where the shot went? I don't think that it was clear. I think Officer Sanchez said that the shot was fired into the ground. But again, the officers don't know what he's going to do next. And I think the imminent threat is when he is waving the gun all around. And he's saying, I got one more call. I got one more call to make. And he's not responding to any of the commands. And from Officer Wilsey's perspective, when he's saying one more call. And I got this gun, I got this gun. I got, I got the 45, 45. What does one more call mean? What do you think that, that he was saying when he said one more call? He did say, I got one more call and then we're going to effing end it. So those. What? He said that he was going to make a call to his mother.  So he's making statements and the gestures that he's making to the officer. As well as, you know, telling even at one point, like I said, told Officer Agner, who's trying to communicate with him. I'm going to hurt you. And so given the fact that he's never indicating that he's surrendering. And there's no indication from the officers that he's just going to shoot himself. Without also shooting them. And I think if that were the facts of the case, then maybe the plaintiff would have a better argument as far as the threat that he posed. Is the officers, they're getting statements from him. Where he's directing his anger towards them and just defiance towards them. As well as he's making a statement saying all I need to do is make one more call. And then we're, then we'll end it. And that's where I go back to the case law. Where in Val Verde, there's a very thorough analysis of precedents within the 10th Circuit. As well as in Val Verde itself. When even if the actions of the person shot are ambiguous. The question is, was based upon the information within the officer's knowledge. Did at any point, did this person no longer pose a threat? As far as, was he trying to dispose of the gun? Was he trying to comply? Was he trying to surrender? And those just aren't the facts of this case. And so I think under both prongs. Can I interrupt you to ask you to talk about if we reach the clearly established prong. Can you compare this case to Pauley? And tell me why Pauley doesn't provide clearly established law in this case? Well, because in Pauley. The second Pauley case. The second, when it came back on remand. When it came back on remand. I'm trying to remember. Because those officers in Pauley, like Mr. Villa suggested. They were safely behind cover. And these officers, because of the lack of the barrier. And the officers by the police vehicle were not safely behind cover. And based upon Officer Wilson. They had some, they had some cover. That is correct. And that's in Pauley. They had us like a two foot wall, a stone wall. You know, they were kind of crouched behind. It wasn't full cover. But that was the case. And it was dark. And, you know, in that case. So they couldn't be seen as well either. So, but here, yeah. I don't know. I'm just wondering how it compares. There is some cover here. There was some cover in Pauley. And in Pauley, you had the individual pointing the gun. At the, in the direction of one of the two officers. Uh, you know, here we don't have that. And yet we found no violation there. In Pauley. Or a violation. I'm sorry. Yeah, go ahead. In Pauley, there was a barrier. That being a wall. In this scenario, Mr. Cordova. He was the one. He didn't, he wasn't barricaded. He was in full control of his own actions. As far as his movement. Whether or not he's moving down the driveway. Away from the truck. Within the door of the truck. And I think because of the dynamics of the situation. In the driveway. In this case, it distinguishes from Pauley. To where it was individual. He was inside of a house. And the officers who were at a barricade of the wall. Thank you. Thank you. She went over a little bit. Did you want. You look to me like you might want another 20 seconds. Just to respond to her. Not raising. Absolutely. You can always give an attorney more time to talk. I think, you know, there's always going to be some differences. When we talk about somebody behind coverage. You know, but the look at how Judge Riggs resolved the question below. Which was she found that the officers were behind cover. That was the state of the record. You know, whether it's as good a cover as in Pauley. I think that's not the issue. The issue is that they were safely behind cover. And that and I disagree that with Miss Griffin. That it was escalating to the point at the time of the shooting. That Mr. Cordova was going to be firing on the police imminently. Okay, thank you. Thank you, counsel. Cases submitted. Counselor excused.